UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

ERNEST GREEN,
    a/k/a "Ern,"
RODSHAUN BLACK,
    a/k/a "Rashaun Black" a/k/a "Shaun,"
DANIEL RODRIGUEZ
    a/k/a "Danny," and
AMILCAR RAMOS,
    a/k/a "Gotto,"

        Defendants.

**DECISION AND ORDER**
12-CR-83S (1)(2)(3)(5)

## I. INTRODUCTION

Defendants Ernest Green, Rodshaun Black, Daniel Rodriguez, and Amilcar Ramos have each moved for severance under Rules 8 and 14 of the Federal Rules of Criminal Procedure.[1] (Docket Nos. 191, 201, 422, 425, 426, 427.) The motions collectively raise three grounds for severance: (1) misjoinder under Rule 8 of the Federal Rules of Criminal Procedure; (2) prejudicial joinder under Rule 14 arising from the "spillover effect" of evidence that will be introduced as to only certain defendants; and (3) prejudicial joinder arising from the introduction of co-defendant confessions that implicate Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

For the following reasons, Defendants' severance motions are denied.

---

[1] In a separate Decision and Order, this Court granted Defendant John W. Coronado, Jr.'s motion to sever. (Docket No. 571.)

## II. BACKGROUND

In summary fashion, the government expects that its trial proof will establish the following facts:

> In the early part of November 2009, defendant [Ernest] Green was released from state prison. Looking for money, Green asked Amilcar Ramos, who he could rob. Ramos told Green about Jabril Harper since Harper had recently purchased a car from Ramos about a month earlier. According to Ramos, [Harper] paid cash for the vehicle, however, Ramos, unbeknownst to Harper, stole the car shortly after the sale. On December 16, 2009, Ramos and another individual (hereinafter CW for Cooperating Witness) were driving in Ramos' van, and Ramos received a telephone call from John Coronado. Coronado indicated he was at the Pine Harbor apartments and that Ramos should come over. When they got there, Coronado was present along with Green, [Rodshaun] Black and Danny Rodriguez. Ramos told them that Harper was "getting money." All agreed to rob Harper, and Black advised that he had a .45 pistol. Because Rodriguez knew Harper, he called Harper and asked him to meet outside to sell him drugs. Rodriguez took the gun from Black because Harper did not know Black and they thought if Black was the one to approach Harper, he might become suspicious and flee. When Harper came out, Rodriguez approached him, displayed the gun, and told him to get into the back of the van. Rodriguez then gave the gun back to Black, who got in the back of the van with Harper. The van then departed the scene with Ramos driving, the CW in the front passenger seat, and Harper and Black in the back seat.
>
> While in the van, Black demanded money from Harper. Harper indicated he had lost his money "to a car," (referring to the car he had bought from Ramos which Ramos had later stolen back from Harper). Black started to hit Harper with the gun and eventually Harper indicated he had approximately $160 and an "8-ball and a half." Black then took the items along with Harper's jewelry and two cell phones. While still inside the van, Black spoke by cell phone to Rodriguez and/or Green, and then told Ramos to drive to 7th Street.

2

On 7th street, Green, Rodriguez and Coronado arrived in a maroon colored car driven by Coronado, and pulled into a random driveway. The van pulled up next to the maroon car. A discussion ensued and Ramos and the CW were telling Black to let Harper go. Rodriguez said, "no, we gonna take him home," while Green said, "no, I'm not going back to jail." While still in the driveway of this house, Harper was taken out of the van, beaten, and put into the trunk of the maroon car. Black got into the maroon car with Coronado, Green, and Rodriguez. Several independent witnesses observed this and called 911. Coronado drove away in the maroon car with Black, Green, and Rodriguez inside, and Harper in the trunk. Ramos and the CW left in the van.

Ramos dropped the CW off at his house, while Coronado drove the maroon car to Roosevelt Park. At Roosevelt Park, Green and Black took Harper out of the car and walked him into the park. Rodriguez and Coronado stayed in the car. In the park, Black and Green both shot Harper in the head, and then returned to the car. Afterwards, Green, Black, Rodriguez and Coronado went to an apartment in Buffalo, New York to meet Green's girlfriend. At this apartment, Green gave his girlfriend the jewelry which was taken from Harper earlier that night. Because the jewelry had blood on it, Green's girlfriend washed it. Green also gave his girlfriend coats, and other items of clothing to hide and get rid of. Green told his girlfriend that he had robbed someone, and for her to watch the news, and keep him posted. Meanwhile, Ramos and the CW, who were not present at the murder scene or Green's girlfriend's apartment, went home. However, later that night, Ramos called the CW and told him "he's gone" and to "watch the news." The CW watched the news and learned a body had been found in Roosevelt Park.

Later in the evening, Buffalo Police received a 911 call of a body in Roosevelt Park. The Buffalo Police responded and observed a body, later identified as Jabril Harper, laying on the ground with apparent bullet holes in his wrist and head. Recovered at the scene, and later at the morgue, were two fired .45 caliber cartridges, and two fired bullets. An autopsy was performed by the Medical Examiner and determined the cause of death to be two gunshot wounds to the head.

. . .

> Finally, the proof will show that on January 4, 2010, Green and Black robbed Morris Singer. During the course of the robbery, Green and Black used similar methods to rob Singer, as they did when they robbed Jabril Harper. In addition, during the robbery of Singer, Green and Black demanded money, threating Singer by telling him that the body in Roosevelt Park a couple weeks ago was their work. Green and Black took jewelry from Singer, and also money that Singer's girlfriend was forced to bring to Green and Black.

(Docket No. 504.)

Stemming from these incidents, Defendants are charged in a 9-count superseding indictment.

Counts 1 through 5 of the superseding indictment relate to the robbery, extortion, kidnaping, and murder of Jabril Harper. In Counts 1 and 2, each defendant is charged with Hobbs Act conspiracy and Hobbs Act robbery and extortion, in violation of 18 U.S.C. §§ 1951 (a) and 2. In Count 3, each defendant is charged with kidnapping, in violation of 18 U.S.C. §§ 1201 (a)(1) and 2. In Count 4, Defendants Green, Black, Rodriguez, and Coronado are charged with discharge of a firearm causing death, in violation of 18 U.S.C. §§ 924 (j)(1) and 2. In Count 5, each defendant is charged with the use, brandish, and discharge of a firearm, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i), (ii), (iii) and 2.

Counts 6 through 9 of the superseding indictment relate to the robbery, extortion, and kidnaping of Morris Singer. In Counts 6 and 7, Defendants Green and Black are charged with Hobbs Act conspiracy and Hobbs Act robbery and extortion, in violation of 18 U.S.C. §§ 1951 (a) and 2. In Count 8, Defendants Green and Black are charged with kidnapping, in violation of 18 U.S.C. §§ 1201 (a)(1) and 2. In Count 9, Defendants Green

and Black are charged with the possession and brandish of a firearm, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i), (ii) and 2.

### III.  DISCUSSION AND ANALYSIS

#### A.  Severance

Decisions on severance are reserved to the trial court's discretion and are considered by the Second Circuit to be "virtually unreviewable."  See United States v. Harwood, 998 F.2d 91, 95 (2d Cir. 1993); United States v. LaSanta, 978 F.2d 1300, 1306 (2d Cir. 1992) (quoting United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991)). There is, however, a preference in the federal system that defendants who are indicted together be tried together.  See United States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983). This is particularly true when the underlying crime involves a common scheme or plan, in which case the slight prejudice to co-defendants is outweighed by the judicial economies resulting from avoiding duplicative trials.  See United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003); Cardascia, 951 F.2d at 482.  Joint trials are efficient, "play a vital role in the criminal justice system," and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  Richardson v. Marsh, 481 U.S. 200, 209-10, 107 S. Ct. 1702, 1708, 95 L. Ed. 2d 176 (1987).

#### B.  Rules 8 and 14 of the Federal Rules of Criminal Procedure

Multiple offenses may properly be charged together in an indictment or information if the offenses are "of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8 (a).  Similarly, multiple defendants may properly be charged together

in an indictment or information "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8 (b). Defendants may be charged in one or more counts together or separately, and all defendants need not be charged in each count. Id.

Yet even if properly joined, offenses or defendants may be severed if joinder results in prejudice to a defendant or the government. Fed. R. Crim. P. 14 (a). In such a case, the court may provide any relief that justice requires, including ordering separate trials of counts or severing the defendants' trials. Id. But "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993).

**C.    Defendants' Motions for Severance**

As indicated, Defendants' motions collectively raise three grounds for severance: (1) misjoinder under Rule 8 of the Federal Rules of Criminal Procedure; (2) prejudicial joinder under Rule 14 arising from the "spillover effect" of evidence that will be introduced as to only certain defendants; and (3) prejudicial joinder arising from the introduction of co-defendant confessions that implicate Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). None of these arguments are persuasive.

First, joinder is proper under Rule 8. Counts 1-5 and Counts 6-9 are properly joined because they are "of the same or similar character." Fed. R. Crim. P. 8 (a). Both sets of counts involve nearly identical charges (Hobbs Act conspiracy, robbery, extortion,

6

kidnaping, and brandish of firearm), with the major exception being that Counts 6-9 do not contain a charge under 18 U.S.C. §§ 924 (j)(1) for discharge of a firearm causing death. The charges are also contemporaneous, with Counts 1-5 occurring between November 2009 and December 16, 2009, and Counts 6-9 occurring on or about January 4, 2010. (Docket No. 155.) In addition, two defendants overlap in all 9 counts, and the nature and method of the acts charged in both sets of counts are similar. Joinder of Defendants is also proper largely for these same reasons. See Fed. R. Crim. P. 8 (b) (providing that joinder of defendants is proper when two or more defendants are alleged to participate in the same act of transaction and providing that all defendants need not be charged in each count). Joinder is therefore proper under Rule 8.

Second, Defendants have not demonstrated "prejudice so substantial as to amount to a miscarriage of justice," United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988) (citing United States v. Bari, 750 F.2d 1169, 1177 (2d Cir. 1984)), or "prejudice . . . so great as to deprive [them] of [their] right to a fair trial," United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989), which is required for severance based on prejudicial joinder under Rule 14. Defendants argue that they will be unfairly prejudiced by the "spillover" of certain evidence. Defendants Rodriguez and Ramos maintain that they will be prejudiced if not severed from Green and Black because the jury will hear evidence of Green's and Black's involvement in Counts 6-9, which do not involve Rodriguez and Ramos. Each defendant also claims potential prejudice from the possible introduction of evidence that relates only to their co-defendants, such as evidence that Green jumped out a third-story window during a police interview and that Black was convicted of

7

possessing the firearm used to kill Harper.[2]

But some level of prejudice stemming from the introduction of evidence against a co-defendant is present in all joint trials. See United States v. Carpenter, 689 F.2d 27 (2d Cir. 1982) (noting that "a certain amount of prejudice to a defendant is regarded as acceptable given the judicial economies that result from joinder"). Indeed, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." Cardascia, 951 F.2d at 483. The Second Circuit has held, in fact, that "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993).

Limiting instructions ameliorate this inherent prejudice, and Defendants have not shown that limiting instructions will be ineffective in this case. See Richardson, 481 U.S. at 211 (noting the rule that juries are presumed to follow instructions); United States v. Page, 657 F.3d 126, 129 (2d Cir. 2011) (noting that limiting instructions often will suffice to cure any risk of prejudice and permit joinder); United States v. Rittweger, 524 F.3d 171, 179 (2d Cir. 2008) (rejecting claim of prejudicial spillover where "the district court gave limiting instructions throughout the trial explaining when evidence could not be considered against a particular defendant, and the jury charge carefully explained that the jurors must consider the case against each defendant separately"). "Indeed, 'limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may

---

2 This evidence is the subject of a pending motion in limine. (Docket No. 531.)

result from a multi-defendant, multi-count trial.'"  United States v. Santana, No. 13 CR 147 (KMW), 2015 WL 5781413, at *4 (S.D.N.Y. Oct. 1, 2015) (quoting United States v. Santiago, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001)).  In addition, Defendants have failed to establish a serious risk that a trial right will be compromised or that a joint trial will prevent the jury from making a reliable judgment about guilt or innocence.  See Zafiro, 506 U.S. at 539.  The lack of substantial prejudice paired with the strong federal policy favoring joint trials leads to the conclusion that Defendants' request for severance on this basis must be denied.[3]

Finally, as far as this Court is aware, the severance of Defendant Coronado has eliminated any Bruton issues.  (Docket No. 571.)  "The crux of [the Confrontation Clause] is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination."  United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009) (internal quotation marks omitted).  In Bruton, the Supreme Court recognized the risks posed by "powerfully incriminating extrajudicial statements of a co-defendant, who stands accused side-by-side with the defendant," which are then "deliberately spread before the jury in a joint trial."  Bruton, 391 U.S. at 135-36.  Thus,

---

[3] Defendant Green also argues that severance of Counts 6-9 from Counts 1-5 is required because "the death of the victim in the first incident [Counts 1-5] would so dispose the jury against the defendants in Counts 6 through 9 that they could not fairly maintain the presumption of innocence through the close of evidence, or uphold the standard for proof beyond a reasonable doubt, as to that second incident [Counts 6-9]."  (Docket No. 191.)  This Court is not persuaded.  Limiting instructions together with instructions to the jury concerning the presumption of innocence, the burden of proof, and that they must consider each defendant separately will cure any risk of prejudice.  See United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998) (finding risk of prejudicial spillover mitigated by district court's "repeated admonitions to the jury that each defendant's guilt had to be separately and individually considered").

when the statement of a defendant implicates one or more of his co-defendants, Bruton demands "a redaction and substitution adequate to remove the 'overwhelming probability' that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant." Jass, 569 F.3d at 60.

Defendants had all moved for severance from Coronado under Bruton because he made a 3-hour videotaped confession that implicated each of them. But the Bruton issues raised by Coronado's confession are now moot, because this Court severed Coronado to preserve his constitutional right to present a complete defense. (Docket No. 571.) Although Defendants' early motion papers reference statements made by co-defendants other than Coronado, the government and defense counsel worked together to narrow the Bruton severance issues for this Court's review, resulting in the submission of only Coronado's altered statement as at issue. (Docket Nos. 442, 449, 461, 487.) No other specific statements or proposed alterations under Bruton have been submitted for this Court's review. Accordingly, Defendants' Bruton arguments are moot and do not constitute a basis for severance.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions for Severance are each denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motions for Severance (Docket Nos. 191, 201, 422, 425, 426, 427) are DENIED.

SO ORDERED.

Dated:	October 19, 2017
	Buffalo, New York

                                                      /s/William M. Skretny
                                                      WILLIAM M. SKRETNY
                                                    United States District Judge